IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : <br> : <br> : |
| v. | : Case No. 21-CR-178 (APM) <br> : |
| PETER J. SCHWARTZ, | : <br> : |
| Defendant. | : |

**DEFENDANT PETER SCHWARTZ'S MOTION FOR CHANGE OF VENUE OR, IN THE ALTERNATIVE, TO ALLOW EXPANDED EXAMINATION OF PROSPECTIVE JURORS BEFORE AND DURING VOIR DIRE**

Defendant Peter J. Schwartz ("Mr. Schwartz"), by and through undersigned counsel, respectfully moves the Court to transfer these proceedings to another district because in this District the prejudice against his defense is so great that an impartial jury cannot be empaneled. In the alternative, if the Court were to deny a venue transfer, Mr. Schwartz respectfully moves the Court to permit expanded examination of prospective jurors before and during formal voir dire. As to his alternative request, Mr. Schwartz would respectfully request that:

1. the defense be allowed to prepare a questionnaire that, after review and approval by the Court, would be distributed to summoned prospective jurors to return before trial;

2. the parties be present for any pre-screening questioning of prospective jurors that the Court conducts before the beginning of formal voir dire; and

3. the parties be permitted to question jurors individually during voir dire.

This case involves notorious events at the United States Capitol Building on January 6, 2021. A transfer of venue is essential to secure Mr. Schwartz's constitutional right to a fair trial, because "so great a prejudice against the defendant exists in [this District] that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). If a transfer is denied, then

only through expanded examination of prospective jurors can the defense mitigate the prejudice that would infect a trial in this District.

## I. INTRODUCTION

This case involves events that much of the public has strong opinions about, including opinions about the intentions of persons who attended the riots outside of the Capitol Building on January 6th. As this motion describes below, those opinions are especially strong, and especially prejudicial to Mr. Schwartz, in this District. Those preexisting views are so widespread in the District's jury pool that they pose a grave threat to Mr. Schwartz's right to a fair trial.

The government has disclosed to Mr. Schwartz evidence showing a distinct asymmetry between, on the one hand, his conduct on January 6, 2021, and, on the other, the mental states alleged in the Second Superseding Indictment. While the evidence at trial is likely to show that Mr. Schwartz was outside of the Capitol Building when the riots occurred, the Second Superseding Indictment alleges that he, among other things, "willfully and knowingly engaged in disorderly and disruptive conduct in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress or either House of Congress." In this District, there is an intolerable risk that jurors' preexisting views will fill any gaps between allegations and evidence.

Mr. Schwartz has the right to be tried by a jury that will judge him on the evidence alone, without being tempted to tar him with the same brush as others who were present at the Capitol Grounds or who shared some of his political views. The case should be transferred to a different district because the potential for that temptation among jurors drawn from this District is simply too great. If the Court does not transfer the case, then expanded examination of prospective

jurors will be essential to minimize the extent to which a trial would be infected by prejudice against the defendant.

## II.     FACTUAL BACKGROUND

On January 6, 2021, Mr. Schwartz travelled to Washington, D.C., with his wife, Shelley Stallings, to listen to former President Donald J. Trump's speech.  He was one of thousands of individuals who then walked to the U.S. Capitol after Trump issued a call to action.  On February 2, 2022, Mr. Schwartz was arrested in his home in Uniontown, Pennsylvania, on an arrest warrant issued by the United States District Court for the Western District of Pennsylvania.

In a Second Superseding Indictment, Mr. Schwartz has been charged with three counts of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Counts One, Three, and Four); one count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count Two); one count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Aiding and Abetting, in violation of 18 U.S.C. § 111(a)(1) and (b) and 2 (Count Seven); one Count of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2 (Count Eight); one count of Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count Nine); one count of Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count Ten); one count of Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count Eleven); one count of Disorderly Conduct in the Capitol Grounds or Buildings, in violation of 40 U.S.C. §

5104(e)(2)(D) (Count Twelve); and one count of Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Thirteen). [ECF 63].

On February 4, 2021, Mr. Schwartz had his initial appearance in the Western District of Pennsylvania. Subsequently, Mr. Schwartz was committed to and transferred to the District of Columbia.

### III.     ARGUMENT

The Fifth Amendment's Due Process Clause and the Sixth Amendment's Jury Trial Clause guarantee a defendant the right to a fair trial by an impartial jury. *Skilling v. United States*, 561 U.S. 358, 378–79 (2010). "The great value of the trial by jury certainly consists in its fairness and impartiality." *United States v. Burr*, 25 F. Cas. 49, 51 (CC Va. 1807); *see also In re Murchison*, 349 U.S. 133, 136 (1955) (The right to an impartial jury is a cornerstone of due process).

Ordinarily, the trial should be held in, and the jury should be drawn from, "the State and district wherein the crime shall have been committed," U.S. Const. amend. VI. But "if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process'"— then "[t]he Constitution's place-of-trial prescriptions . . . *do* not impede transfer of the proceeding to a different district at the defendant's request," *Skilling*, 561 U.S. at 378 (*quoting In re Murchison*, 349 U.S. at 136).

This case involves events, and interpretations of events, about which much of the public already holds fixed opinions that are prejudicial to Mr. Schwartz and his defense. Where "so great a prejudice against the defendant exists in the [venue] district that the defendant cannot obtain a fair and impartial trial there," a court "must transfer the proceeding . . . to another district," Fed. R. Crim. P. 21(a) (emphasis added).

Moreover, in "the extreme case," *Skilling*, 561 U.S. at 381, where "[the] trial atmosphere [has been] utterly corrupted by press coverage," *id*. at 380 (*quoting Murphy v. Florida*, 421 U.S. 794, 798–99 (1975)), a court must presume prejudice from the pretrial publicity. Unlike "actual prejudice," which only can be confirmed through voir dire, *see id*. at 385–95, presumed prejudice presents a threat to due process that cannot be negated by jurors' voir dire responses. *See id*. at 379 (noting that because of presumptive prejudice in *Rideau v. Louisiana,* 373 U.S. 723 (1963), the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that trial in the contested venue violated due process (*quoting Rideau*, 373 U.S. at 727)).

Courts consider the following factors in determining whether to grant a change of venue request: (1) the size and characteristics of the community; (2) the nature and extent of pretrial publicity; (3) the proximity between the publicity and the trial; and (4) evidence of juror partiality. Skilling, 561 U.S. at 382–83. In addition, in some cases, a potential jury pool can be presumed to be irredeemably biased, when the alleged crime results in "effects . . . on [a] community [that] are so profound and pervasive that no detailed discussion of the [pretrial publicity and juror partiality] evidence is necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) (transferring the trial of the Oklahoma City bombing suspects from Oklahoma City to the District of Colorado).

Each of these considerations weighs strongly in favor of presumed prejudice in this case.

**A.     Size and Characteristics of the Community.**

The Supreme Court in *Skilling* concluded that "the size and characteristics of the community in which the crime occurred" militated against a presumption of prejudice. *Skilling*, 561 U.S. at 382. There, the defendant was a former executive at Enron during that company's notorious accounting scandal, and the community was Houston, where "more than 4.5 million

individuals eligible for jury duty resided." *Id.* The Court observed that, "[g]iven this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id.* Coincidentally, the Court offered as a favorable comparison its conclusion in a prior case that the "potential for prejudice [was] mitigated by the size of . . . 'metropolitan Washington [D.C.].'" *Id.* (*citing Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991)). But *Mu'Min* was referring to "the metropolitan Washington statistical area, which has a population of over 3 million," 500 U.S. at 429 (emphasis added), not to D.C. itself. The District of Columbia is far smaller than that; even today the population is less than one-fourth of 3 million. And indeed, the District's population is exceptionally small and compact as federal judicial districts go. The Census Bureau estimates that D.C.'s total population was 670,050 on July 1, 2021, with approximately 18.2 percent being under the age of 18, leaving a voting-age population under 550,000.[1] The District's juror pool certainly is larger than the 150,000-person population of the Louisiana parish in Rideau. *See Skilling*, 561 U.S. at 382. But D.C.'s entire population resides in a space of just 68.34 square miles.[2] With the Capitol Building near the geographic center, all of the District's residents live within 7½ miles of the site.

The events of January 6th have been huge news nationally and even internationally, but the fact remains that they affected D.C. residents much more directly than persons outside the District. As one resident told a reporter the next day:

> I have not been able to digest any of the atrocities that took place last night here in Washington, D.C., you know, literally eight blocks away from my front door. I've been having a lot of conversations with people this morning, loved ones. We're all hurting. We're

---

[1] *U.S. Census Bureau Quickfacts: District of Columbia*, https://www.census.gov/quickfacts/DC (last visited Feb. 23, 2022).
[2] U.S. Census Bureau, *District of Columbia: 2010* 13 (2012), https://www.census.gov/prod/cen2010/cph-2-10.pdf#page=33.

6

terrified. We're in shock. And I think it's going to take a while. This is by far the darkest moment of my 45-year existence.

D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol, CBC (Jan. 7, 2021), https://www.cbc.ca/radio/asithappens/as-it-happensthursday-edition-1.5864816/d-c-residentwho-gave-blm-protesters-refuge-condemnsatrocities-at-u-s-capitol-1.5864894. That resident's views were personal, but he expressed a shared, communal viewpoint echoed in many other media interviews, reflecting a shared set of experiences: The city's mayor ordered a citywide curfew, declared a state of emergency for more than two weeks after January 6th, and discouraged out-of-towners from attending the Presidential Inauguration on January 20th because of road closures and heightened security.[3] Thousands of National Guardsmen—ultimately, tens of thousands—"streamed into the region" in the days after January 6 and leading up to the Inauguration.[4] And, as D.C. residents are particularly aware, the aftershocks of January 6th continue to reverberate in concerns and security measures in anticipation of follow-up protests.[5]

---

[3] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning6pm-today; *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor's-order-extending-today%E2%80%99spublic-emergency-15-days-a1; Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021), https://www.washingtonian.com/2021/01/11/dc-mayor-says-americansshould-not-come-to-washington-for-the-inauguration/.

[4] Ellen Mitchell, Army: Up to 25,000 National Guard in DC for Biden inauguration, The Hill (Jan. 15, 2021), https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-forbiden-inauguration.

[5] Colleen Long et al., In Edgy Washington, Police Outnumber Jan. 6 Protesters, U.S. News (Sept. 18, 2021), https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rallysupporting-jan-6-rioters ("In a city still on edge after the Jan. 6 insurrection, law enforcement bore down in large numbers on the Capitol on Saturday over concerns that a rally in support of the jailed rioters would turn violent."); Billy House and Chris Strohm, Jan. 6 Anniversary Will Bring Heightened Security to Capitol, Bloomberg (Jan. 3, 2022), https://www.bloomberg.com/news/articles/2022-01-03/jan-6-anniversary-will-bring-heightened-security-to-capitol (reporting that "Capitol Police, federal and local agencies are beefing up

Finally, the government's allegations in this case, by their nature, stoke partisan passions that in this District would be overwhelmingly hostile toward Mr. Schwartz.  The charges against him include that he "impede[d] and disrupt[ed] the orderly conduct of Government business and official functions" and "inten[ded] to impede, disrupt, and disturb the orderly conduct of a session of Congress or either House of Congress"—specifically, the certification of President Biden's Electoral College victory.  Conscientiously held political views are no reason to disqualify any juror, but those views nevertheless serve to heighten the prejudice gainst Mr. Schwartz's defense in this District, where President Biden received more than 92 percent of the vote in the 2020 Election.[6]  The government is prosecuting Mr. Schwartz for attempting to prevent the certification of a result that D.C. residents overwhelmingly supported.

In the District of Columbia, both "the size and [the] characteristics of the community" lend strong support for a presumption of prejudice that would prevent a fair trial in the District.

### B. Nature and Extent of Pretrial Publicity.

In *McVeigh*, in finding that a change of venue was necessary, the court emphasized, amongst other things, the sharp contrast between the portrayals of the defendants and the victims in the public mind. *See McVeigh*, 918 F.Supp. 1467, at 1472.  Just like the January 6th defendants, the defendants in that case were demonized and associated with right wing militia groups. *Ibid.*  It is almost impossible to overstate the extent and the negative tenor of media coverage of the events that Mr. Schwartz's charges link him to.  And because that coverage has overwhelmingly assigned collective fault to those who gathered at the Capitol Building on

---

security at the U.S. Capitol complex ahead of this week's anniversary of the Jan. 6 insurrection," and "added police power will be significant and visible").

[6] *General Election 2020: Certified Results*, D.C. Bd. of Elections (Dec. 2, 2020), https://electionresults.dcboe.org/election_results/2020-General-Election.

January 6th the prejudicial effects of media coverage are unusually widespread and evenly distributed across the accused. In *Skilling*, the Court noted that presumed prejudice could arise from media coverage that "readers or viewers could not reasonably be expected to shut from sight" as jurors. 561 U.S. at 382. That is a fitting description of January 6th coverage, given both the amount of coverage and its content.

That is especially important here, because the government has charged Mr. Schwartz with mental states that cannot easily be inferred from his own conduct, viewed in isolation. It seems inevitable that the case against him will depend on imputing to him the intentions actually exhibited by others at the Capitol that day. Limiting the permissible evidence and arguments can prevent some unfair guilt-by-association messaging. But as the following paragraphs explain, much of that messaging already has been accomplished by media coverage that no pretrial ruling could eradicate.

The January 6th events at the Capitol have been ascribed once-in-a-generation infamy in media coverage and, indeed, in public discourse. At a one-year anniversary observance, [Vice President Kamala] Harris compared the Jan. 6 insurrection to two other dates when the United States came under attack: Dec. 7, 1941, when the Japanese bombed Pearl Harbor, and Sept. 11, 2001, when terrorists turned commercial airplanes into missiles and attacked the World Trade Center and the Pentagon:

> "Certain dates echo throughout history, including dates that instantly remind all who have lived through them where they were and what they were doing when our democracy came under assault," Harris said. "Dates that occupy not only a place on our calendars but a place in our collective memory."

Annie Linskey, Biden goes after Trump for lies and self-aggrandizement in Jan. 6 insurrection anniversary speech, WashingtonPost.com (Jan. 6, 2022), https://www.washingtonpost.com/politics/biden-goes-after-trump-for-lies-and-self-

9

aggrandizement-in-jan-6-insurrection-anniversaryspeech/2022/01/06/fdb39c14-6eff-11ec-aaa8-35d1865a6977_story.html. The Washington Times, like media outlets throughout the country, also carried the quote.[7] The Vice President was hardly the first to draw such a parallel.[8] This coverage has not focused significantly on Mr. Schwartz, so neither he nor any other January 6th defendant is personally notorious like 9/11 plotters Osama Bin Laden and Zacarias Moussaoui, or Enron executives Kenneth Lay and Jeffrey Skilling. But that is largely beside the point. There is no equivalent "face of" January 6, 2021, among those who were present at the Capitol.

What will matter in this case is not individualized prejudice, but prejudice to all, which already is firmly rooted for the most crucial issues in this case. Given the amount of surveillance video from the Capitol premises, the details of Mr. Schwartz's conduct on January 6th are unlikely to be contested much at trial. Instead, the most disputed element for most counts likely will be *mens rea*—a matter that, "[e]xcept in extraordinary circumstances, . . . cannot be proved by direct evidence" and must be inferred from circumstantial evidence. *United States v. Haldeman*, 559 F.2d 31, 115 (D.C. Cir. 1976).

Prejudicial views about the intentions of January 6th defendants are not confined to D.C., but they are significantly more pervasive and more negative here. A Federal Public Defender-commissioned survey starkly demonstrates that reality. A full summary of the survey is attached

---

[7] Valerie Richardson, *Republicans accuse Democrats, media of exploiting Jan. 6 riot*, WashingtonTimes.com (Jan. 6, 2022), https://www.washingtontimes.com/news/2022/jan/6/republicans-accuse-democrats-media-exploiting-jan-/.

[8] *See, e.g.*, David Mastio, *After ousting Liz Cheney, Republicans prove they're a bigger threat than 9/11 hijackers*, USA Today (May 13, 2021), https://www.usatoday.com/story/opinion/voices/2021/05/13/jan-6th-insurrection-greater-danger-democracy-than-9-11-column/5057119001/ ("As surely as the terrorists of 9/11 wanted to tear down American democracy in 2001, the terrorists of Jan. 6 want to tear down our democracy . . . . Yes, 9/11 cost many more lives than Jan. 6 has so far, but comparing the two attacks is reasonable because the Big Lie is more dangerous to our way of life than the 2001 terrorists' medieval ideology ever was.").

hereto as <u>Exhibit "A"</u>.  For instance, 63 percent of national respondents said they would describe the actions of "people who forced their way into the U.S. Capitol on January 6, 2021," with the phrase "Trying to overturn the election and keep Donald Trump in Power". *Id*. at 4-5.  Far more D.C. residents—85 percent—said the same. *Ibid*.  That disparity also characterized the phrase "Trying to overthrow the US government," which 54 percent of national respondents—compared to 72 percent of D.C. respondents—found applicable. *Ibid*.  Most D.C. residents have prejudged the guilt of January 6th defendants who have been criminally charged, like Mr. Schwartz. Residents of both this District and the Northern District of Georgia were asked for their "Opinion of whether people arrested for Jan 6 activities are guilty or not guilty of the charges brought against them." *Id*. at 7.  Among Georgia respondents, 54 percent answered "Guilty," 10 percent said "Not guilty," and the remaining 36 percent volunteered a response recorded as either "Depends" or "Don't know/refused." *Ibid*.  Respondents in this District, however, were much more convinced of defendants' guilt and much less ambivalent in their answers: 71 percent said "Guilty"; just 3 percent said "Not guilty"; 16 percent volunteered a response recorded as "Depends"; and 10 percent volunteered a "Don't know/refused" response. *Ibid*.

      In short, this is a case in which "a pattern of bitter prejudice throughout the community . . . render[s] the voir dire an unsatisfactory device for selection of an impartial jury." *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. Cir. 1976).  There is no obvious recent example of another event that has drawn media coverage as extensive as the coverage surrounding the events here.  The jury pool in this District, especially, will comprise "readers or viewers [who] could not reasonably be expected to shut from sight" what they have read and seen. *Skilling*, 561 U.S. at 382.

In those circumstances, prejudice should be presumed; in fact, prejudice is plainly apparent in the survey responses of the large majority of D.C. residents who already have decided that defendants with charges like Mr. Schwartz's are guilty.

The extent and tone of media coverage, like D.C.'s size and characteristics, weigh heavily in favor of presumed prejudice.

### C. Proximity between Publicity and Trial.

In *Skilling*, the Supreme Court noted that the argument for presumed prejudice was weakened by the passage of time: "[O]ver four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." 561 U.S. at 383. But *Skilling* does not provide a useful analogy for this case. Media attention here was much more intense from the outset; more than a year has passed; and the reckoning over January 6th continues to generate front-page news. The investigation and actions of a House Select Committee regularly feature prominently in print, television, and internet media. In addition, entertainment media continues to produce new content, including documentaries by several major media companies.[9] At the same time, criminal prosecutions are progressing in the public eye, receiving widespread coverage. If "the decibel level of media attention" is "diminish[ing]" at all, *see Skilling*, 561 U.S. at 383, it is doing so at a near-glacial pace.

Moreover, with the passage of time, the focus of media attention and public discourse has shifted away from the raw details of the events at the Capitol, and toward a matter that is far

---

[9] *See, e.g.*, Four Hours at the Capitol (HBO 2021), https://www.hbo.com/documentaries/four-hoursat-the-capitol; 24 Hours: Assault on the Capitol (ABC News 2021), https://www.hulu.com/series/24-hours-assault-on-the-capitol; Day of Rage (N.Y. Times 2021), https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html.

more prejudicial in this case: diagnosing protesters' motives.  That naturally focuses most intently on collective motives, since the intentions of any particular individual are of little public interest, with very few individuals having achieved much notoriety.  There is no indication that the passage of time has meaningfully mitigated the prejudice in this District against Mr. Schwartz's defense.

The Court should presume prejudice because, for all the reasons discussed above, "voir dire [would be] an unsatisfactory device for selection of an impartial jury." *Ehrlichman*, 546 F.2d at 916 n.8.  And since a presumption of prejudice is warranted here, this proceeding must be transferred to another district to comply with Rule 21 and the Fifth and Sixth Amendments' guarantees of due process and a fair trial by an impartial jury.

      **D.**      **Jury is Irredeemably Biased.**

As set forth above, the residents of the District of Columbia view themselves as victims of the attacks on the U.S. Capitol.  In fact, the Court itself appears to view the residents of the District as victims.  Other defendants who have been released pending trial, including Mr. Schwartz's co-defendants, Shelly Stalling and Markus Maly, were ordered to stay out of the District of Columbia except for attendance at Court proceedings.  *See, e.g.,* Orders setting Conditions for Release [ECF 74 and 82].  If the residents of the District are not considered to be victims, such orders would not be necessary.

An impartial jury with an open mind is critical to a fair trial.  However, if a juror is also the victim of the crime with which the defendant is charged, it is impossible for the juror to be impartial.

**IV.     IF THE COURT WERE TO DENY A TRANSFER OF VENUE, THEN EXPANDED EXAMINATION OF PROSPECTIVE JURORS BEFORE AND DURING FORMAL VOIR DIRE WOULD BE CRUCIAL TO MITIGATE ACTUAL PREJUDICE**

If the Court concludes that prejudice should not be presumed or cannot yet determine whether it should be, then the parties' opportunity for expanded examination of prospective jurors is absolutely essential for a fair trial. *See Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire."). For instance, although the Supreme Court did not find presumed prejudice in *Skilling*, it acknowledged that "the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," and noted approvingly that the district court's "extensive screening questionnaire and followup voir dire were well suited to that task." 561 U.S. at 384.

Views prejudicial to Mr. Schwartz's defense are so widespread in this District's jury pool that empaneling a sufficiently impartial jury might not be possible. But if it is possible, such a jury could be identified only through expanded examination that allows the parties a thorough opportunity to explore individual prejudices. To accomplish that, Mr. Schwartz would ask the Court to permit the three devices described in the introduction to this motion: (1) a questionnaire to be sent, after review and approval by the Court, to summoned prospective jurors; (2) the right for the parties to be present during any pre-screening questioning the Court conducts before formal voir dire; and (3) individual questioning during voir dire. The facts that show why these measures are necessary are the same facts relied upon in Part II of this motion. Those facts—relating to the District's characteristics, pretrial media coverage, and the undissipated immediacy of January 6, 2021—demonstrate an undeniable and intolerable risk that actual prejudice would

14

prevent a fair trial, regardless of whether the Court concludes that the facts establish presumed prejudice.

## CONCLUSION

WHEREFORE, based upon the foregoing, Defendant Peter J. Schwartz respectfully requests that this Honorable Court will grant his motion for change of venue. In the alternative, he respectfully requests that an expanded examination of prospective jurors before and during formal voir dire be conducted.

Respectfully submitted,

/s/ Dennis E. Boyle
Dennis E. Boyle
Boyle & Jasari
1050 Connecticut Ave, NW
Suite 500
Washington, DC 20036
dboyle@dennisboylelegal.com
bjasari@dennisboylelegal.com
Telephone: (202) 430-1900

*Counsel for Defendant Peter J. Schwartz*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 30th day of August 2022, I electronically filed the foregoing Motion and Proposed Order with the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ Dennis E. Boyle
Dennis E. Boyle