**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 21-CR-178 (APM) |
| | : | |
| JEFFREY BROWN, | : | |
| Defendant. | : | |
| | : | |

<u>**DEFENDANT JEFFREY BROWN'S**</u>
<u>**MOTION TO TRANSFER VENUE OR CONTINUE TRIAL**</u>

COMES NOW the Defendant, Jeffrey Brown, through counsel, and respectfully moves this Court to Transfer Venue pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure and the Fifth and Sixth Amendment to the Constitution. In the alternative if the Court does not grant a Transfer in Venue, Defendant respectfully requests a continuance of the current trial date scheduled to start on November 1, 2022.

**<u>Background</u>**

The Washington, D.C., protests on January 6, 2021, were unprecedented—in the scope of the physical incursion into the transition of power that day, and as in the subsequent investigations, media coverage, and political discourse that continues unabated. Mr. Brown was one of the thousands of individuals who attended the political rallies on January 6, 2021, in exercise of his First Amendment right and privilege to protest, to speak out about voting rights, and to otherwise draw attention to political issues of concern to him.

He traveled to the capital based on his heartfelt concern for the future of this country, and his concern that certain grievances were not being heard or considered by public figures, the media, and the larger public who may not be aware of these matters. He did not travel with a malevolent heart or with broader designs on violence, destruction, or criminal mischief. His

single social media post documented his travel by posting a picture of himself—while boarding

a plane on the way to Washington, D.C.— with the message, "Boarding LAX."

He did not coordinate with criminal conspirators, he did not plan with or fall under the

leadership of political groups—such as the Proud Boys, Oath Keepers, or other fringe political

groups—he did not bring a weapon, armor, or any other instrument or tool suggesting force or

violence.  He simply traveled to the capital to be a part of a larger political expression that he

believed was important.

In spite of these intentions, events of the day spiraled beyond all expectations, and Mr.

Brown eventually found himself swept up closer into the protesting crowd outside the Capitol.

Based on his alleged actions that day, the Government arrested Mr. Brown in October of 2021

at his residence in California on a criminal complaint alleging Inflicting Bodily Injury on

Certain Officers (18 U.S.C. § 111(a) and (b)); Civil Disorder (18 U.S.C. § 231(a)(3)); Entering

and Remaining in a Restricted Building or Grounds, Disorderly and Disruptive Conduct in a

Restricted Building or Grounds, and Engaging in Physical Violence in a Restricted Building or

Grounds (18 U.S.C. § 1752(a)(1), (2), and (4)); Disorderly Conduct on Capitol Grounds,

Impeding Passage Through the Capitol Grounds or Buildings, and an Act of Physical Violence

in the Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(D), (E), and (F)). (ECF No. 1.)

Superseding indictments followed, alleging substantially the same claims. (ECF No. 42, 63.)

The Government alleges various offenses related to Mr. Brown's action near the Capitol

on January 6, 2021; the most serious claim is that he injured law enforcement by using pepper

spray.  While this claim is a matter of factual dispute, it is clearly the most serious allegation as

Mr. Brown did not otherwise enter the Capitol building, did not destroy property, and did not

engage in any other alleged physical acts of violence.

2

Whether due to political disposition, the trauma and effect of being in the capital on January 6, or the relentless onslaught of media attention—which often paints January 6 protestors as radical terrorists—independent polling demonstrates that relevant jury pool is predisposed in its opinion regarding the events of January 6, and that Mr. Brown will not be able to receive a fair and impartial trial in this District.  Additionally, the recent airing of the January 6 Committee's political investigation on primetime national television, has further prejudiced Mr. Brown's ability to receive a fair and impartial trial in the District, where political news and coverage of this sort is so often consumed.

Finally, Mr. Brown's trial dates will straddle the upcoming midterm elections in November; meaning jurors will be sitting for this case while being overwhelmed by the political entreaties that are increasingly invasive from political parties and political candidates on every side of the aisle in the lead up to national elections.  The messaging, debates, and arguments from these parties and candidates will re-open the wound felt in the District related to January 6 at a time when jurors will be asked to dispassionately hear and consider evidence in this matter. For these reasons individually and collectively, a transfer of venue or, at a minimum, a continuance is appropriate.

## Argument

**A.**     **Transfer of Venue.**

Rule 21 of the Federal Rules of Criminal Procedure prescribes that transfer is required where the defendant cannot obtain a fair and impartial trial:

> Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Rule 21 supports the Fifth Amendment's and the Sixth Amendment's guarantee of fair trial by an

impartial jury for criminal defendants.  *Cf. United States v. Burr*, 25 F. Cas. 49, 51 (CC Va.

1807)("The great value of the trial by jury certainly consists in its fairness and impartiality.").

Extraordinary local prejudice and predisposition makes a fair and impartial trial

impossible, which supports transfer under Rule 21.  *Skilling v. United States*, 561 U.S. 358, 130

S.Ct. 2896 (2010); *see also Sheppard v. Maxwell,* 384 U.S. 333, 362 (1966) ("Due process

requires that the accused receive a trial by an impartial jury free from outside influences.").

While adverse pretrial publicity in itself does not necessitate transfer, a "huge . . . wave of public

passion" and where the venire possessed "a belief in [defendant's] guilt" is grounds for transfer.

*Irvin v. Dowd*, 366 U.S. 717, 728 (1961) (vacating a conviction and death sentence for the trial

court's failure to transfer venue for community publicity).  In addition to pretrial publicity, the

community prejudice of an event can be so pervasive that transfer is appropriate and required.

*See, e.g., United States v. McVeigh*, 918 F.Supp. 1467 (W.D.Okla. 1996); *see also United States

v. Awadallah*, 457 F. Supp. 2d 246 (S.D.N.Y. 2006).

Following the Supreme Court's decision in *Skilling*, district courts evaluate four factors

to determine whether transfer is required:

 (i)  the size and characteristics of the community;
 (ii)  the nature and extent of the pretrial publicity;
 (iii)  the proximity between publicity and the trial; and
 (iv)  evidence of juror partiality.

*Skilling,* 130 S.Ct. at 2915 - 17.

**B.** **Applying the *Skilling* Factors Shows that Transfer is Appropriate and Required.**

 **1.** **The Size and Characteristics of the Community**.

The District of Columbia has an estimated population of approximately 670,000 people

as of July 1, 2021, with a voting-age population of closer to 500,000.  *See*

https://www.census.gov/quickfacts/DC (last visited August 30, 2022).  Relevant to the political

undercurrents in this case, it is a predominant democratic voting electorate: 93% of voters in

2020's election cast a ballot for Joe Biden for president, compared with 5.4% for Donald Trump.

*See* https://www.politico.com/2020-election/results/washington-dc/ (last visited August 30,

2022).

In addition to being one of the most homogeneous voting blocks in the nation, it is often

one of the most engaged and knowledgeable electorates since it is the seat of the federal

government.  The fact it is the capital is exactly why so many protestors descended on the

District on January 6, 2021.  This means that the jury pool in this matter is nearly uniform in its

opposition to former President Trump—and thereby presumably its supporters—and, by interest

and occupation, the intended target of the January 6 opposition.

2. **Pretrial publicity**.

The January 6 protests have been some of the most widely circulated, viewed, and

publicized political events in history.  This is owing both to the symbolic attack on the transfer of

power, and to the practical reality that it is one of the most video-recorded events in history.

Between government surveillance cameras, law enforcement body cameras, bystander videos,

and participants' own videos and pictures, the footage and commentary and been publicized at an

unprecedented level. The Government's repeated representations to the Court regarding the

unprecedented discovery in these matters underscores this point.

In addition to publicity through traditional media and social media, government leaders,

including the current presidential administration, have labeled participants in the January 6

protests "violent extremists," "extremists," "white supremacist," and "insurrectionists" among

other terms.  The Department of Justice now refers to the events of January 6 as a "siege" on the

Capitol.  More offensive vitriol has been common from other commentators.  Regardless of what

views one personally holds, it is hard to imagine an event that has been covered more stridently.

      **3.**      <u>**Proximity between Publicity and the Trial**</u>.

Adding fuel to the last twenty months of publicity and coverage, the Congressional January 6 Committee has recently introduced coverage and publicity of the January 6 events through multiple prime time media events.  This is relevant both to the level of publicity this has pushed into the jury pool—which by its community makeup is predisposed to politically oppose the January 6 protests—but also to proximity that this publicity has to the trial, which is quickly approaching.

The Committee has already held six hearings during June and July 2022, with promises of more hearings in the next couple of months.  *See* https://january6th.house.gov/ (last visited August 30, 2022).  At the conclusion of the last July hearing, Committee Vice Chair Liz Cheney said, "[w]e have much work yet to do, and we will see you all in September."  *See* https://www.latimes.com/politics/story/2022-06-13/what-is-the-tv-schedule-for-the-next-jan-6-committee-hearings (last visited August 30, 2022).  Whether in September, October, or the beginning of November, this means that the spotlight will again return to January 6 and allegations related to that day.  The publicity from the local media and as presented through this Committee has been predominantly negative, and often eager to portray protestors as bad actors who were set out in pursuit of a violent coup.

There are few allegations that could be more prejudicial to a criminal defendant than these claims through the media and seemingly reinforced by government institutions.  Moreover, the connection between the hearings and the prosecution of Mr. Brown is anything other than speculative and tenuous; on June 13, 2021, Attorney General Merrick Garland told NPR, "I can assure you that the January 6 prosecutors are watching all the hearings[.]"  *See*

https://www.npr.org/2022/06/13/1104659339/the-attorney-general-and-federal-prosecutors-are-watching-all-of-the-jan-6-hearings.

The upcoming November midterm elections ("Midterms") will further exacerbate the prejudice from the unrelenting negative media and congressional attention.  Midterms are scheduled for November 8, 2022, the mid-point of the scheduled trial dates. Even now, headlines warn of the "battle for control" in the Midterms:

> The Senate is a 50-50 split (with Vice President Kamala Harris' tie-breaking vote giving them the advantage) and Speaker Nancy Pelosi's control of the House rests on a slim margin. In 2022, all 435 House seats and 35 of the 100 Senate seats are on the ballot. Additionally, 36 out of 50 states will elect governors.

*See* https://www.cnn.com/election/2022 (last visited August 30, 2022).  This coverage and the intensity of the "battle" will only increase as November 8 draws near.  On August 17, 2022, the Washington Post quoted an expert as saying that the "stakes [in the midterms] are perhaps higher for D.C. than any other jurisdiction."  *See* https://www.washingtonpost.com/dc-md-va/2022/08/17/dc-midterms-statehood-congress/  (last visited August 30, 2022).

Considering that politics, voting, and institutional government control were central to the January 6 rally and the public's response, the upcoming Midterms will only serve to re-energize and focus the jury pool's attention on matters of politics and policy.  This will necessarily increase the likelihood that Mr. Brown will not be able to receive a fair and impartial trial based on facts and evidence, particularly in this District, where media coverage has been continuous, and where political leanings are overwhelmingly opposed.

4.     **Evidence of Jury Partiality**.

The results of a Federal Public Defender survey demonstrate the deep-seated partiality held by potential jurors, and the inescapable mix of politics, media, and views of January 6

protestors.  *See Federal Public Defender Survey*, *United States v. Schwartz*, 1-21-cr-178 (APM), ECF No. 118.  The overwhelming political partiality of a jury pool in a criminal prosecution that involves intense overtones of political concerns is inherently a problem that cannot be rooted out by *voir dire.  See, e.g.,* Kerr, N L, et al. "On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study." *American University Law Review*, vol. 40, no. 2, 1991, pp. 665–701.

The survey shows that this is not simply a national problem, felt in every jurisdiction in the same way.  Rather, residents of the district have far greater entrenched negative views of January 6 protestors than potential jurors in other jurisdictions.  This is not simply conjecture, this is the outcome of studied inquiry.  *See also* Lux Research Survey, *United States v. Caldwell*, 1-21-cr-028 (APM), ECF No. 654-1.

When combined with the political predisposition of District jurors, the pervasive and overwhelmingly intense media attention, the on-going January 6 Committee hearings, and upcoming Midterms, Mr. Brown simply cannot receive a fair and impartial jury in Washington, D.C., on November 1, 2022.

<u>**Conclusion**</u>

Because the prejudice against the Defendant exists in the District that the Defendant cannot obtain a fair and impartial trial there, Defendant respectfully requests that the Court grant this Motion for a Transfer of Venue.  In the alternative, Mr. Brown requests a continuance of the scheduled trial until such a time after the upcoming Midterm elections.

Date: August 30, 2022                                    Respectfully submitted,

                                                                          Jeffrey S. Brown
                                                                          By Counsel

/s/ *Samuel C. Moore*
Samuel C. Moore
Law Office of Samuel C. Moore, PLLC
526 King Street, Suite 506
Alexandria, Virginia 22314
Phone: (703) 535-7809
Fax: (571) 223-5234
scmoore@scmoorelaw.com
*Counsel for Jeffrey Brown*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Defendant's Motion for Transfer of Venue was served upon counsel of record through ECF on the date of filing.

/s/ *Samuel C. Moore*
Samuel C. Moore
Law Office of Samuel C. Moore, PLLC
526 King Street, Suite 506
Alexandria, Virginia 22314
Phone: (703) 535-7809
Fax: (571) 223-5234
scmoore@scmoorelaw.com
*Counsel for Jeffrey Brown*