## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **Case N. 21-CR-178 (APM)** |
| | : | |
| **PETER J. SCHWARTZ,** | : | |
| | : | |
| **Defendant.** | : | |

### SENTENCING MEMORANDUM ON BEHALF OF PETER J. SCHWARTZ

Peter J. Schwartz ("Mr. Schwartz") submits this sentencing memorandum in support of his request for a sentence of 54 months' incarceration. Although his conduct is indeed serious, it is significant to note that Mr. Schwartz's actions were not motivated by any desire for personal financial gain or any other type of benefit. Rather, his actions were motivated by a misunderstanding as to the facts surrounding the 2020 election. Indeed, Mr. Schwartz knew next to nothing about the 2020 election and listened to sources of information that were clearly false. Mr. Schwartz has learned valuable life lessons from this incident, and he will never repeat the actions that bring him before the Court in this case. For the reasons set forth in greater detail below, we request a 54-month sentence because we believe it to be "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

As explained in greater detail below, Mr. Schwartz was one of thousands of protestors who walked to the U.S. Capitol Building on January 6, 2021, after former U.S. President Donald J. Trump asked his supporters to march towards the U.S. Capitol Building in protest of the 2020 presidential elections and "fight" on his behalf. This represents one of the saddest episodes in

American history.  There remain many grifters[1] out there who remain free to continue

propagating the "great lie" that Trump won the election, Donald Trump being among the most

prominent.  Mr. Schwartz is not one of these individuals; he knows he was wrong.

Mr. Schwartz's sentencing guideline range, as calculated by the Probation Officer, is 168

months to 210 months.  However, this is a case where the guidelines themselves should be

discarded since they fail to take into account Mr. Schwartz's unique personal attributes.  The

defense argues that pursuant to all of the 18 U.S.C. 3553(a) factors, a sentence of 54 months'

incarceration would be appropriate in this case.

## I.     FACTUAL BACKGROUND

Mr. Schwartz's life prior to the instant offense was characterized by hard work and a

focus on his religious and moral beliefs.

Prior to his detention, Mr. Schwartz was living in Pennsylvania for his employment, but

considers his home to be Owensboro, Kentucky.  Mr. Schwartz centered his life around family

and religion.  The letters appended hereto demonstrate how he has impacted their lives.

### A.     Peter Schwartz's Family Background

Mr. Schwartz was born on July 19, 1973, in Peoria, Illinois. PSR ¶ 159.  Mr. Schwartz

states he was raised in a "stable, Christian family, and he was not subjected to any form of abuse

or neglect". *Id.* ¶ 160.  Mr. Schwartz continues to have a close relationship with his parents.  His

father, Ron Schwartz is 74 years of age and is retired. *Id*. ¶ 161.  Mr. Schwartz's mother is 73

---

[1] It is noteworthy that Steve Bannon was convicted of two counts of Contempt of Congress. After his conviction, he used his Podcast to call for 4,000 "shock troops" to "deconstruct" the Government.  Mr. Bannon is a far more dangerous individual than Mr. Schwartz; however, he was sentenced to four (4) months in prison. *See* DOJ Press Release, available at: *https://www.justice.gov/usao-dc/pr/stephen-k-bannon-sentenced-four-months-prison-two-counts-contempt-congress* (October 21, 2022).

years old and is also retired. *Id.* Mr. Schwartz has a very close relationship with his parents, as well as his sister Laura Yoshida, who is 52 years old and works in public relations. *Ibid.* His family knows Mr. Schwartz to be a "sincere and kindhearted" individual. *Id.* ¶ 165.

**B.     Peter Schwartz's Educational and Professional Background**

Mr. Schwartz attended East Peoria Community High School in East Peoria, Illinois, up through the 11th grade. *Id.* ¶ 175. In 1991, Mr. Schwartz earned his General Equivalency Diploma (GED) in Tazewell County, Illinois. *Id.* After receiving his GED, Mr. Schwartz attended a welding program offered through Illinois Central College in East Peoria, and in 1991 he entered the workforce as a welder. *Id.* Mr. Schwartz has several welding certifications and has also participated in a journeyman course in marble masonry. *Id.*

Hard work is a pillar in Mr. Schwartz's upbringing and values. At the time of his arrest, Mr. Schwartz was employed as a welder in Uniontown Pennsylvania. *Id.* ¶ 166. From 2015 through 2021, Mr. Schwartz worked mainly for Titan Construction in Owensboro, Kentucky, earning $28 an hour and roughly $75,000 annually. *Id.* ¶ 178. Upon his release, Mr. Schwartz intends to return to his employment with Titan Construction and other welding companies he has work for.

**C.     Peter Schwartz's Arrest**

In February 2021, Mr. Schwartz was arrested for the present offense. On January 6, 2021, Mr. Schwartz travelled to the District of Columbia in order to attend a rally in support of former U.S. President Donald J. Trump. During these demonstrations, President Trump asked his supporters to march towards the U.S. Capitol Building in protest of the 2020 presidential election and "fight" on his behalf. Alongside thousands of other members of the crowd, Mr. Schwartz walked to the U.S. Capitol Building and entered the building.

3

Mr. Schwartz had no larger role in the planning or organization of the protests or the rioting that ensued in and around the Capitol Building.  Mr. Schwartz accepts responsibility for his wrongdoing and is sincerely remorseful for his conduct.  He is committed to facing the consequences of his actions and rebuilding his life after making a big mistake.

### D.      Peter Schwartz is a Pillar in his Family

Mr. Schwartz was raised by his parents in Illinois, who instilled in him positive values and the relevance of hard work.  As a dedicated and caring son, brother, and friend he has always exhibited values of loyalty, intelligence, creativeness, thoughtfulness, honesty, hard-work, and love for his family and others, as attested by his family. *See* Exhibit "A".

Mr. Schwartz's father, Ronald Schwartz, describes his son as quintessential family man who is a "deeply reflective person." *Id.* at 1. Ronald Schwartz states that Mr. Schwartz is an extremely considerate individual who "never fails to send cards in recognition of family events or holidays." *Ibid.*  Further, Ronald Schwartz explains how Mr. Schwartz is an "excellent welder", which requires him to travel often, "this does not keep him from staying in touch with his mother and me." *Ibid.*

Mr. Schwartz's mother, Sue Schwartz, depicts the close relationship Mr. Schwartz has with his family.  She states when he is staying with his parents, they "do many things together, as a family (bowling, cornhole, board games, movies, church, etc.). *Id.* at 2.  She explains that "[Peter] is very willing to help us since we are not able to do all we used to be able to do." *Ibid.* Mrs. Schwartz describes her son as "intensely loyal, intelligent, creative, and thoughtful." *Ibid.* "Over the years, the many, many cards, letters, and gifts he has given me have brought so much love and joy to this mother's heart." *Ibid.*  Moreover, Mr. Schwartz's mother explains that he can excel in anything he puts his mind to, whether it's "artistic, intellectual, or even spiritual

4

endeavors."  Even while incarcerated, Mr. Schwartz calls his mother nearly every day to speak.
*Ibid.*  Mrs. Schwartz respectfully requests that her "emotional hardship" will be considered when
determining a sentence. *Ibid.*

## II.      ADVISORY GUIDELINE RANGE

The Probation Officer has calculated an advisory guideline range of 168 months to 210
months, resulting from a total offense level of 30 and Criminal History Category VI.  The
guideline range offers no useful advice because it (1) is the product of a guideline that is not
based on empirical evidence or national experience; (2) would result in unwarranted disparity as
compared with sentences for similarly situated Defendants; and (3) is far greater than necessary
to promote the goals of sentencing in this case.

The guideline range, however, is only one of the factors the Court must consider under 18
U.S.C. 3553(a).

## III.     A SENTENCE OF 12 MONTHS' INCARCERATION WOULD BEST SATISFY THE GOALS OF §3553(a).

The Court must " impose a sentence sufficient, but not greater than necessary, to
comply with the purposes set forth in paragraph (2)," which are "the need for the sentence
imposed

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and
> to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training,
> medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2).  In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a)(1)-(7).

No workable guideline could ever "account for many of the myriad factors that are properly considered in fashioning just sentences." *See United States v. Ovid, slip op*., 2010 WL 3940724, *1 (E.D.N.Y. 2010).  A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which are taken into account by the guideline range.

### A.     The Guidelines are not Based on Empirical Evidence or National Experience and Fail to Promote any Purpose of Sentencing.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that assure the meeting of the purposes of sentencing, 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point". 28 U.S.C. § 994(m).  The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra  L. Rev. 1, 7

(1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be fair to assume that the guidelines reflect a rough approximation of sentences that "might achieve§ 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id*. at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role, because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case." *Id*. at 109-10.

The guideline regarding offenses involving obstruction of official proceedings is not based on empirical data of past practice or on national experience since then. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2D1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

**B.     Need for Just Punishment in Light of Seriousness of the Offense.**

The need for retribution is measured by the degree of "blameworthiness," which "is

generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?,* 89 Minn. L. Rev. 571, 590 (February 2005).  The guidelines include none of the factors bearing on Mr. Schwartz's degree of culpability.

###        C.        Need for Deterrence.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  "Three National Academy of Science panels ... reached that conclusion, as has every major survey of evidence." *Id*.; *see also* Zvi D. Gabbay, Exp*loring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447048 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, *et al*., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).  The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*., at 1.  It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance." *Id*. at 2.  The report concluded that "the studies reviewed do not

provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1.

According to "the best available evidence, ... prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

### D.    Need for Incapacitation.

Mr. Schwartz has a low risk of recidivism in the above matter.  Not only has Mr. Schwartz learned his lesson from his actions on January 6th, 2021, but the riots that occurred on January 6th, 2021, were a rare occurrence in American History and extremely unlikely to happen again.  Mr. Schwartz will not have any opportunity to participate in similar conduct because the events that took place will almost certainly not take place again.

In *United States v. Munchel*, the United States Court of Appeals for the D.C. Circuit stated that "the specific circumstances that made it possible, on January 6, for [the defendants] to threaten peaceful transfer of power" no longer exist. Case No. 21-3010 (D.C. Circuit March 26, 2021).  Specifically, the court stated that the defendants "had a unique opportunity to obstruct democracy on January 6 because of the electoral college vote tally taking place that day, and the concurrently scheduled rallies and protests.  Thus, [the defendants] were able to attempt to obstruct the electoral college vote by entering the Capitol together with a large group of people who had gathered at the Capitol in protest that day." *Ibid.*  It further noted that "[t]he District Court found that appellants were a danger to 'act against Congress' in the future, but there was no explanation of how the appellants would be capable of doing so now that the specific circumstances of January 6 have passed." *Ibid.*

In short, the circumstances leading up to January 6th no longer exist and there is no risk

that Mr. Schwartz will engage in similar conduct in the future.

      **E.**    **Need to Avoid Unwarranted Disparities and Unwarranted Similarities.**

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, see *Gall*, 552 U.S. at 55 ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two Defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the Defendants), and unwarranted differences among defendants whose conduct and characteristics are similar. *See United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

The list below includes a sample of January 6th cases in which Defendants received sentences substantially below the guideline ranges applicable in those cases, and substantially below the guideline range of 168 months to 210 months applicable here. This Court should take into account the sentencing trend exemplified by this list.

In *Parris*, Judge Block in the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders. At the court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases. *Id*. at 752. Based on these samples, the court concluded that "[t]hose [Defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id*. at 753. The

court relied on this national pattern in arriving at a sentence of 60 months for the two Defendants who faced an advisory guideline range of 360 months to life, which was 16.7% of the bottom of the applicable guideline range. *Id.* at 745.

Here, Probation is recommending a sentence between 168 to 210 months.  Undersigned Counsel has identified forty-two cases in which defendants have been sentenced to 30 months or more imprisonment among the almost 400 January 6th defendants sentenced so far, none of which were for more than 120 months of incarceration.  The Court should impose a sentence of 54 months' incarceration.

The cases from least to greatest sentence are as follows:

(1) *United States v. Miller*, No. 1:21-CR-00075-RDM **33 months' incarceration**

- While on restricted ground of the Capitol, draped in a Confederate flag, threw a full beer can at law enforcement.

- Used a bike rack to scale the Capitol wall.

- Threw batteries at officers.

- Sprayed officers located in the Lower West Terrace tunnel with the contents of a fire extinguisher as other rioters assaulted officers with bats, flagpoles and riot shields. The contents of the fire extinguisher sprayed at least a dozen police officers.

(2) *United States v. Byerly*, No. 1:21-CR-00527-RDM **34 months' incarceration**

- Purchased a stun gun and traveled with it to D.C.

- Engaged in three separate assaults; two against police and one against a news reporter.

- Used his stun gun against Capitol police and MPD officers.

- After having had the stun gun removed from his hands, he continued to charge toward and physically strike officers.

- Grabbed and wrestled an officer for his baton.

(3) *United States v. Thompson*, No. 1:21-CR-00161-RBW **36 months' incarceration**

- Came prepared wearing a bulletproof vest.

- Walked into and looted Senate Parliamentarian's office, stealing two bottles of liquor.

- Stole a coat rack, and announcer pager used by U.S. Capitol Police to send emergency alerts throughout the building.

- Picked up someone's cell phone off a staffer's desk.

(4) *United States v. Tenney*, No. 1:21-CR-00640-TFH **36 months' incarceration**

- Entered the Capitol through the West Terrace.  He then walked through the Rotunda, and personally forced open the Rotunda Doors on the east side which ultimately allowed protestors to enter the building.

- Grabbed the Sergeant at Arms from behind and pushed him into a doorframe. He also locked arms with U.S. Capitol Police Officer B.A. and shoved another U.S. Capitol Police officer.

(5) *United States v. Reid*, No. 1:21-CR-00316-DLF **37 months' incarceration**

- Among the first to rush up the steps when protestors broke through a police line under the scaffolding.

- For over an hour, he walked through the Capitol, surged through police lines, led protestors through the building, and encouraged other protestors to enter.

- Made his way to the Speaker's Lobby and damaged a television and water cooler in the nearby bathroom.

(6) *United States v. Hughes*, No. 1:21-CR-00106-CKK **38 months' incarceration**

- Climbed scaffolding.

- At the front of the mob that forced bike rack barriers down and breached the police line.

- Among first protestors to reach the Upper West Terrace. Ninth protestor to enter the Senate Wing Door building through smashed window.

- Chased a Capitol Police officer and yelled violent and angry threats.

(7) *United States v. Smith*, No. 1:21-CR-00567-RCL **41 months' incarceration**

- Assisted a group of protestors in hoisting and thrusting a large metal sign frame into a line of officers. The sign could have "split someone's head open."

- Encouraged protestors to keep forcing a door closed so that officers could not exit and defend the Capitol.

(8) *United States v. Rubenacker*, No. 1:21-CR-00193-BAH **41 months' incarceration**

- One of the first 50 protestors to enter the Capitol.

- Was at the front of the mob, along with other protestors, and chased a Capitol police officer up a flight of stairs, directly past where lawmakers had just retreated from conducting the joint session, yelling "Where are

they counting the votes?" and "He's one person, we're thousands!"

- Exited the east side of the Capitol and reentered later through the East Rotunda doors as part of a mob of protestors, during which protestors surrounded and assaulted law enforcement officers attempting to prohibit entry to the East Rotunda doors.

- Smoked marijuana in the Rotunda.

- Swung a water bottle at an officer's head and threw liquid at other officers.

(9) *United States v. Fairlamb*, No. 1:21-CR-00120-RCL **41 months' incarceration**

- Shoved and Punched an MPD officer.

- Climbed the scaffolding.

- Entered the Capitol carrying a stolen police baton.

(10) *United States v. Chansley*, No. 1:21-CR-0003-RCL **41 months' incarceration** (Released early)

- "Q-Anon Shaman" and the face of the events of January 6th.

- Climbed the scaffolding.

- Entered the Capitol and roamed the second and third floors of the building.

- Entered the Senate gallery and screamed obscenities.

- Scaled the Senate dias "taking the seat that Vice President Mike Pence had occupied less than an hour before" and took pictures of himself on the dias.

- Called other protestors up to the dias and lead them in an incantation including to be thankful for the "opportunity to allow us to send a message to all the tyrants, the communists, and the globalists, that this is our nation, not theirs, that we will not allow American, the American way of the United States of America to go down."

- Gave a 60 Minutes interview falsely claiming that he was let into the Capitol by law enforcement and was merely intending to bring divinity, to bring God back into the Senate.

(11) *United States v. Secor*, No. 1:21-CR-00157-TNM **42 months' incarceration**

- Scaled scaffolding.

- Walked through the office suite of Nancy Pelosi.

- Assisted a group of protestors to push open the East Rotunda doors and helped other protestors enter the building.

13

- Sat in the seat that Vice President Mike Pence occupied 30 minutes earlier

(12) *United States v. Mault*, No. 1:21-CR-00657-BAH **44 months' incarceration**

- Anticipated and planned for violence in pre-riot text message conversations with co-defendant Mattice.

- Pushed against the line of police, broke the line, and forced the police barriers apart, overwhelming and surrounding the police.

- Body-surfed over members of the crowd and hung from the wooden frame beneath the arch.

- Assaulted police officers.

(13) *United States v. Mattice*, No. 1:21-CR-00657-BAH **44 months' incarceration**

- Anticipated and planned for violence in text message conversations with co-defendant Mault.

- Recorded a video conveying his intent and foreshadowing his violent conduct. He explained, "We're all getting ready to go march on Capitol Hill. We're gonna fuck some shit up. It's about to be nuts."

- Pushed against the line of police, broke the line, and forced the police barriers apart, overwhelming and surrounding the police.

- Texted family to brag about breaking police line.

- Body-surfed over members of the crowd and hung from the wooden frame beneath the arch.

- Used chemical spray against police officers.

- Lied to FBI agents claiming that he did not fight with police but, instead simply absorbed their blows without fighting back.

(14) *United States v. Languerand*, No. 1:21-CR-00353-JDB **44 months' incarceration**

- Threw a piece of wood at police.

- Just a few minutes later, threw a heavy black audio speaker at the police.

- One minute later, threw two sticks in rapid succession at officers.

- Three minutes later, threw another stick at officers.

- A few seconds later, threw a large orange traffic bollard which ricocheted off the riot shield of an officer before colliding with multiple officers inside the archway.

- A minute later, threw a pepper spray container followed by a bottle of liquid.

- Approximately 30 seconds later, threw a piece of wood.

14

- Then threw another stick at the police.

(15) *United States v. Thompson*, No. 1:21-CR-00461-RCL **46 months' incarceration**

- Joined protestors as they actively assaulted police.

- Armed himself with a police baton and incited violence outside of the Capitol. Also stayed in the heart of the violent zone, watching hours of attacks against law enforcement. Indeed for nearly two hours he stood "in the vicinity of some of the most violent conduct on January 6, observing, commenting and occasionally chanting while windows were smashed, and the police line was repeatedly attacked."

- Provided protestors with riot shields to use against the police which had previously been stolen from the police.

- Assisted in throwing a large audio speaker at police.

- Assaulted a police officer with a baton when the officer was trying to assist a protestor needing medical attention.

(16) *United States v. Richardson*, No. 1:21-CR-00721-CKK **46 months' incarceration**

- Struck a police officer three times with a metal flagpole, stopping only when the pole broke in his hands.

- Retreated after he was pepper sprayed. Two minutes later, he and other protestors grabbed and shoved a large metal billboard toward the police, using it as a battering ram.

(17) *United States v. Hughes*, No. 1:21-CR-000106-TJK **46 months' incarceration**

- Climbed scaffolding.

- Among first protestors to reach the Upper West Terrace.

- Eighth protestor to enter the Senate Wing Door building through smashed window.

- Kicked the Senate Wing Door open from inside with another protestor.

- Chased a Capitol Police officer and yelled violent and angry threats.

- Occupied the Senate chamber and reviewed sensitive documents that had been left behind by Senators forced to flee for their lives.

(18) *United States v. Coffman*, No. 1:21-CR-00004-CKK **46 months' incarceration**

- Drove to Washington on January 6th from Alabama in a pickup truck containing loaded firearms, including a 9mm handgun, a rifle, and a shotgun. Also, inside the pickup truck and in its covered bed were hundreds of rounds of ammunition, large-capacity ammunition feeding devices, a crossbow with bolts, machetes, camouflage smoke devices, a stun gun, cloth rags, lighters, a cooler containing eleven mason jars with

holes punched in the lids, and other items. The eleven mason jars each contained a mixture of gasoline and Styrofoam. The mason jars and their contents, along with the lighters and cloth rags, made up the component parts of bottle-based improvised incendiary weapons (i.e. Molotov cocktails).

- The Styrofoam in the Molotov cocktails was designed to have a napalm effect of adhering to the skin of its victims.

- A month before January 6th, he had traveled to Washington and attempted to drive to the residence of a United States Senator.

(19) *United States v. Ochs*, No. 1:21-CR-00073-BAH **48 months' incarceration**

- Proud Boys member.

- Threw smoke bomb at police.

- Smoked cigarettes in Rotunda.

- Pointed protestors toward the Speaker's Office.

- Posed in front of "Murder the Media" graffiti his co-defendant had scrawled on one of the Capitol's doors.

(20) *United States v. Herrera*, No. 1:21-CR-619-BAH **48 months' incarceration**

- Convicted after a trial.

- Came prepared wearing a gas mask, goggles, and a bulletproof vest.

- Climbed scaffolding and entered the Capitol through a fire door, located near the Senate Parliamentarian's Office on the Senate wing side of the building.

- Posted an Instagram photo of himself picking up a stack of papers and throwing them in the air. Later, in an exchange with someone else on Instagram, he said he had picked up the papers and had someone photograph him because he wanted a "fuck you" picture.

- Stole a bottle of liquor, which he drank and raised triumphantly as he exited the Capitol the first time.

- Reentered the Capitol through the nearby Senate Wing Doors. As he entered, he walked past shattered windows on each side of the door and spent a few minutes setting up his camera and taking photographs.

- Then he proceeded to a nearby "hideaway" office of a U.S. Senator, where he smoked a marijuana cigarette that was passed around by other protestors.

- After, he proceeded to the Crypt, and remained inside for 15 minutes while he took more photographs, before exiting the building.

(21) *United States v. Hale-Cusanelli*, No. 1:21-CR-37-TNM **48 months' incarceration**

- Convicted after a trial sporting a "Hitler mustache."
- Former Army reservist and security contractor who held a "Secret" level security clearance when he and others sieged the Capitol.
- At front of a mob that attacked police and smashed windows and doors to breach the Capitol.
- Unsuccessfully intervened in an arrest of a protestor by trying to pull the protestor away from the officer.

(22) *United States v. Decarlo*, No. 1:21-CR-00073-BAH **48 months' incarceration**

- Significant ties to Proud Boys.
- Threw smoke bomb at police.
- Rummaged through a Capitol police duffle bag and stole a pair of flex cuffs.
- Scrawled "Murder the Media" on one of the Capitol's doors.

(23) *United States v. Bledsoe*, No. 1:21-CR-00204-BAH **48 months' incarceration**

- Convicted after a trial. Moreover, his PSR recommended a sentencing enhancement based on his false testimony at trial.
- Scaled a wall to access the upper northwest terrace.
- Climbed statue of President Gerald Ford and planted a Trump flag on his arm.
- Remained inside the Capitol for 22 minutes and wandered through the Statuary Hall before joining another crowd of protestors circling the House Chamber while members of Congress were trapped inside and unable to evacuate.

(24) *United States v. Wilson*, No. 1:21-CR-00345-RCL **51 months' incarceration**

- Physically engaged with officers by punching, shoving and kicking them, as well as attempting to steal their riot shields.
- Picked up a several feet long white cylindrical object, believed to be a thin polyvinyl chloride (PVC) pipe, and indiscriminately struck officers with it.
- "[E]ngaged multiple officers with whatever means he had available."

(25) *United States v. Denney*, No. 1:22-CR-00070-RDM **52 months' incarceration**

- Former military police officer.
- Used Facebook to recruit for his militia group called the Patriot Boys of North Texas and fundraised for weapons, gear, lodging, and travel.
- Arrived eager for violence in full battle attire wearing a helmet, knuckled

gloves, and a ballistic vest with body armor under his jacket.

- Deployed pepper spray at the line of Capitol police officers.
- Grabbed and shoved a police officer.
- Threw a pepper spray cannister in the direction of the line of officers.
- Assaulted officers with a pole and attempted to disarm them.
- Along with another protestor, he launched a large tube at the line of police officers guarding the west side of the Capitol building.
- Swung his arm and fist at an officer in an attempt at pulling him down the stairs.
- Lied to FBI agents about his knowledge of the assault.

(26) *United States v. Pruitt*, No. 1:21-CR-00023-TJK **55 months' incarceration**

- Proud Boys member
- Wore a tactical glove with knuckle pads and a cut-off t-shirt with the logo of the "Punisher"–an anti-hero known for dispensing violent vigilante justice.
- Wore an electronic ankle monitor for being arrested recently.
- Climbed a bike rack as a ladder to be at the front of the mob that breached the building.
- Tossed a chair in the direction of officers in the Visitor Center.
- Came face to face with then-Senate Minority Leader Chuck Schumer, who was trying to evacuate.

(27) *United States v. Williams*, No. 1:21-CR-00377-BAH **60 months' incarceration**

- Convicted after a trial.
- Helped protestors climb bicycle racks so that they could overrun the police on the Northwest stairs.
- Stole water bottles that Capitol police officers had stored to be used for decontamination if they were hit with chemical irritants.
- Entered the Capitol through the Senate door with the first large wave of protestors to breach the Capitol.
- Celebrated and smoked marijuana with other protestors in the Rotunda.

(28) *United States v. Mazza*, No. 1:21-CR-00736-JEB **60 months' incarceration**

- Traveled to D.C. with two loaded handguns: a Smith and Wesson, .40 caliber semi-automatic handgun, and a .45 caliber/.410 caliber revolver ("Taurus Judge").

18

- Dropped or lost the Taurus Judge revolver on the steps leading up to the West Front Terrace.

- After entering the Capitol, he joined mob of other protestors who were trying to break through the police line to gain entry into the lower level of the Capitol.

- Armed himself with a stolen police baton and used it to assault police officers.

- Filed false police report about how he had lost the Taurus Judge and provided false information to Capitol Police.

(29) *United States v. Jensen*, No. 1:21-CR-00006-TJK **60 months' incarceration**

- Convicted after trial.

- Ringleader during the attack on the U.S. Capitol, working to rile up the crowd and encourage others to follow him into and through the building.

- Scaled a twenty-plus-foot wall to be one of the first protestors to break into the building and disrupt the proceedings in Congress.

- Tenth protestor to enter the Capitol.

- Led a group of armed protestors in pursuit of an officer up a staircase, steps away from the Senate Chamber, where members of Congress were sheltering at the very moment.

(30) *United States v. Sandlin*, No. 1:21-CR-00088-DLF **63 months' incarceration**

- Traveled to D.C. along with two co-conspirators in a car full of weapons, including several knives, bear spray, Glock 43 pistol, two magazines of ammunition, gas masks, stun gun, slingshot, military -style vests/body armor, two helmets, a baton, walkie-talkies and Sandlin's M&P pocket pistol.

- Made his way through the East Rotunda doors with his co-conspirators and shoved officers to force the door behind them open, allowing the mob outside to begin streaming in.

- Attempted to rip the helmet off an officer.

- Along with his co-conspirators, he engaged in a shoving match with officers in an attempt to keep the doors to the Senate Gallery open, striking an officer's head in the process.

- Wandered through the Capitol in pursuit of members of Congress, asking an unknown individual, "is that where the Senators are at?"

- Smoked a marijuana joint in the Rotunda of the Capitol while stating, "we made history" and "this is our house."

(31) *United States v. Ponder*, No. 1:21-CR-00259-TSC **63 months' incarceration**

- Convicted after trial.

- Recruited co-defendants.

- Swung a pole at an officer and after his pole broke against the officer's shield, he re-armed himself with a sturdier pole and assaulted another officer.

- 15 minutes after the first two assaults, he assaulted another officer with the same sturdier pole.

(32) *United States v. Palmer*, No. 1:21-CR-0328-TSC **63 months' incarceration**

- Was on the steps leading to the LWT tunnel, and having acquired a wooden plank, he threw the plank like a spear at police officers.

- He picked up a fire extinguisher, and sprayed police with its contents. Then, once it was empty, he threw it at police officers.

- He then "cast around for additional items with which he could assault the police." He took hold of a long piece of scaffolding wrapped in canvas and pushed it at the legs of the police.

- He then picked up the fire extinguisher he previously used to assault police and again threw it at police.

- Also, at some point, he picked up an orange traffic barrier and threw it towards the police.

(33) *United States v. Caldwell*, No. 1:21-CR-181-CKK **68 months' incarceration**

- Marine veteran.

- Armed himself with bear spray, outfitted himself with glasses that could protect himself from some of the effects of pepper spray, and brought a hand-held two-way radio.

- Sprayed a line of officers protecting the Lower West Terrace Place with a canister of gaseous chemical irritant.

- Confronted and taunted police officers by asking them to spray, and asking if they were "scared."

- Present on the front lines of the main assault for almost the entire duration of the confrontation.

(34) *United States v. McGrew*, No. 1:21-CR-00398-BAH **78 months' incarceration**

- Former U.S. Marine.

- Flew with bear mace to D.C.

- Entered the Capitol through the unguarded Upper West Terrace doorway.

Prior to entering, he encouraged other rioters, repeatedly yelling, "Let's Go!"

- Struck an MPD officer within seconds of entering the Capitol.

- Screamed at officers and refused to follow instructions to leave the building.

- Struck several more officers, attempted to and successfully grabbed officers' batons, and locked arms with other protestors, in defiance of officer's commands that protestors leave the building.

(35) *United States v. Khater*, No. 1:21-CR-00222-TFH **80 months' incarceration**

- Arrived in D.C. with two containers of bear spray and two containers of hand-held pepper spray.

- Pepper sprayed any police officer he could find for nearly half a minute. He sprayed at least three officers at close range on the Lower West Terrace.

(36) *United States v. Young*, No. 1:21-CR-00291-ABJ **86 months' incarceration**

- Brought 16-year-old son with him.

- Stormed the police line in the tunnel on the Lower West Terrace.

- Handed fellow protestor a taser.

- Worked with another protestor to throw a large audio speaker toward the police line, which missed the officers and struck a fellow protestor on the head, drawing blood.

- Used a long pole or stick to jab towards the police line.

- Joined an attack on an officer by restraining his wrist while a co-defendant removed his police badge and police radio. The officer's wrist was broken by a riot shield moving through the crowd above the protestors' heads.

- Assaulted an officer who was temporarily disoriented and blinded by bear spray by grabbing at his helmet and body, pushing him, and hitting him.

(37) *United States v. Robertson*, No. 1:21-CR-00034-CRC **87 months' incarceration**

- Brought a gas mask and large wooden stick.

- Raised up his wooden stick in "port arms," a tactical position used by the military and law enforcement to push others away and blocked the path of officers attempting to hold back the mob.

- Destroyed evidence from him and a co-defendant prior to arrest.

(38) *United States v. Guy Reffitt*, No. 1:21-CR-00032-DLF **87 months' incarceration**

- Recruiter for an antigovernment movement.

- Stormed the Capitol Building with a firearm.

(39) *United States v. Head*, No. 1:21-CR-00291-ABJ **90 months' incarceration**

- Carried knife on hip.

- Repeatedly struck towards police line with a riot shield.

- Pushed the shield against an officer for nearly three minutes. After a continued struggle with the officer, he wrapped his arm around the officer's neck and yelled, "I've got one!" He then dragged the officer into the mob, isolating him as the crowd violently assaulted the officer.

(40) *United States v. McCaughey*, No. 1:21-CR-00040-TNM **90 months' incarceration**

- Convicted after trial.

- Assisted in overwhelming a police line, taunted and assaulted police officers.

- Used a stolen riot shield to push against Law enforcement officers, trapping them against a door frame.

(41) *United States v. Webster*, No. 1:21-CR-00208-APM **120 months' incarceration**

- Convicted after trial.

- Former Marine and a 22-year veteran of the New York City Police Department

- Traveled to D.C. with an NYPD bulletproof vest and a Smith and Wesson Model 640 revolver, small enough to conceal inside a jacket pocket.

- Carried a large metal flagpole.

- He forcefully pushed against a bike rack. The officer reached across to shove him away but in doing so, struck Webster on his face. Webster then swung the flagpole against the bike rack with enough force to break the metal pole in half. He charged at the officer and tackled the officer to the ground after the officer wrestled the flagpole out of his grip. He then dragged the officer by his helmet, pinned him to the ground, and tried to rip his gas mask off. This caused tear gas to become trapped inside the officer's mask, and his throat and nose began to burn. While he restrained the officer on the ground, other protestors began kicking the officer. He left the officer on the ground and continued toward the Capitol.

By contrast, Mr. Schwartz travelled to Washington D.C. with his wife to listen to former President Trump's speech and walked to the Capitol Building alongside hundreds of other protestors.  Mr. Schwartz did not come prepared to incite violence, attack the Capitol Building or any officers that day—none of his actions on January 6th were planned in

anticipation of his travels.  He did bring a so-called tire knocker with him, but he did not

assault anybody with it or use it to vandalize any property.  If he intended to inflict any

injury on another person that day, he would have used it, but he did not.  Instead, video

footage captured Mr. Schwartz as he was indiscriminately spraying canisters of spray on

Capitol Grounds which caused mild discomfort as prefaced by the officers' testimony at trial.

By contrast, Defendant Matthew Ryan Miller, for example, repeatedly assaulted law enforcement

with beer cans, batteries, and spray, and was sentenced to 33 months' incarceration. *See United

States v. Miller*, No. 1:21-CR-00075-RDM.

Mr. Schwartz' conduct is in no way comparable to the conduct of many other

defendants in these cases who:

- brought firearms and other weapons to the Capitol. *See, e.g., Byerly*, No. 1:21-
  CR-00527-RDM (defendant used a stun gun on officers, received 34 months'
  incarceration); *United States v. Coffman*, No. 1:21-CR-00004-CKK (defendant
  traveled to D.C. with multiple firearms in his truck, received 46 months'
  incarceration); *United States v. Mazza*, No. 1:21-CR-00736-JEB (defendant
  traveled to D.C. with two loaded handguns, received 60 months' incarceration);
  *United States v. Sandlin*, No. 1:21-CR-00088-DLF (defendant traveled to D.C.
  with car full of weapons including guns, bear spray and knives, received 63
  months' incarceration); *United States v. Khater*, No. 1:21-CR-00222-TFH
  (defendant arrived to D.C. with bear and pepper spray, received 80 months'
  incarceration); *United States v. Head*, No. 1:21-CR-00291-ABJ (defendant
  brought knife on to Capitol grounds, received 90 months' incarceration); *United
  States v. Webster*, No. 1:21-CR-00208-APM (defendant traveled to D.C. with

bulletproof vest and revolver, received 120 months' incarceration).

- who engaged in extensive planning prior to their trips, *see, e.g., United States v. Mault*, No. 1:21-CR-00657-BAH (defendant planned for violence through pre-riot text messages, received 44 months' incarceration); *United States v. Herrera*, No. 1:21-CR-619-BAH (defendant came prepared to Capitol, received 48 months' incarceration); *United States v. Denney*, No. 1:22-CR-00070-RDM (defendant used Facebook to recruit for his militia group called the Patriot Boys, received 52 months' incarceration); *United States v. Sandlin*, No. 1:21-CR-00088-DLF (defendant traveled to D.C. with others with a car full of weapons and equipment, received 63 months' incarceration).

- who entered the Capitol Building, *see, e.g., United States v. Thompson*, No. 1:21-CR-00161-RBW (36 months of incarceration); *United States v. Tenney*, No. 1:21-CR-00640-TFH (36 months of incarceration); *United States v. Reid*, No. 1:21-CR-00316-DLF (37 months of incarceration); *United States v. Hughes*, No. 1:21-CR-00106-CKK (38 months of incarceration); or

- who engaged in assaultive conduct which caused serious injuries on officers, *see, e.g., United States v. Head*, No. 1:21-CR-00291-ABJ (defendant repeatedly struck police officers with a stolen riot shield and dragged an officer into the mob where he was assaulted, received 90 months' incarceration); *United States v. Webster*, No. 1:21-CR-00208-APM (defendant dragged an officer by his helmet, pinned him to the ground, and tried to rip his gas mask off received, 120 months' incarceration); *United States v. Young*, No. 1:21-CR-00291-ABJ (defendant joined an attack on officers by restraining an officers wrist and attacking other

24

officers, received 86 months' incarceration).

Furthermore, Mr. Schwartz was not a member of the Proud Boys, Oath Keepers, or any other anti-government organization. *See, e.g., United States v. Ochs*, No. 1:21-CR-00073-BAH (defendant who was a member of Proud Boys and threw smoke bombs at police received 48 months' incarceration); *United States v. Decarlo*, No. 1:21-CR-00073-BAH (defendant who was Proud Boy Member received 48 months' incarceration); *United States v. Pruitt*, No. 1:21-CR-00023-TJK (defendant who was a Proud Boy member, tossed a chair at officers as well as coming face to face with then-Senate Minority Leader Chuck Schumer received 55 months' incarceration ); *see also United States v. Denney*, No. 1:22-CR-00070-RDM (defendant who was the founder of a militia group called the Patriot Boys of North Texas who assaulted law enforcement officers received 52 months' incarceration).

Based on the sentences mentioned above, Mr. Schwartz should receive a similar sentence to those who committed similar conduct, therefore a sentencing range of 168 to 210 months would not be a just sentence in Mr. Schwartz's case. A sentence of 54 months' imprisonment would be consistent with other defendants who were found guilty of similar actions.

### F.    Kinds of Sentences Available.

This Court must consider all of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence ... established [by] the guidelines" zones recommend only a lengthy prison term. *See Gall*, 552 U.S. at 59 & n.11. According to the Supreme Court's decisions in *Gall* and *Kimbrough*, federal judges are free to consider relevant circumstances related to an offense and the history and characteristics of a defendant, and are not tied to the rigid, arithmetic framework of the Guidelines. Indeed, *Kimbrough* and *Gall* have returned sentencing courts to the "federal judicial tradition" of considering "every convicted person as an

individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue." *Gall*, 552 U.S. at 52; *see also United States v. Tornko*, 562 F.3d 558, 560 (3d Cir. 2009) ("The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.").

Ultimately, the Court must "impose a sentence sufficient, but not greater than necessary" to comport with the goals of sentencing. *See United States v. Ollzovsky*, 562 F.3d 530, 552 (3d Cir. 2009). Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 9940).

Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note). Mr. Schwartz is not a "violent and serious offender" who "pose[s] the most dangerous threat to society".

## IV.    CONCLUSION

At the time of Mr. Schwartz sentencing, this Court will be charged with imposing a sentence that is fair, but not "greater than necessary." 18 U.S.C. § 18553(a); *Kimbrough*, 552 U.S. at 101. This bedrock principle of sentencing law cannot be fulfilled in Mr. Schwartz's case

if he is sentenced at or near the range proposed by the Guidelines.  Rather, as reflected by the

data and analogous case law above, a sentence of 54 months is more appropriate in this case.

Date: April 17, 2023                                Respectfully Submitted,

                                                    */s/ Dennis E. Boyle*
                                                    Dennis E. Boyle, Esquire
                                                    Blerina Jasari, Esquire
                                                    Boyle & Jasari
                                                    1050 Connecticut Ave, NW
                                                    Suite 500
                                                    Washington, D.C., 20036
                                                    Email:  dboyle@dennisboylelegal.com
                                                            bjasari@dennisboylelegal.com
                                                    Phone: (202) 430-1900

                                                    *Counsel for Defendant Peter J. Schwartz*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send an electronic notification of such filing to all counsel of record.

*/s/ Dennis E. Boyle*
Dennis E. Boyle, Esquire